UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SUZANNE A. MERTES,

                                        NO. CIV.S-06-1742 LKK/GGH

          Plaintiff,

     v.

MICHAEL W. WYNNE, Secretary,
United States Department of
the Air Force,

          Defendant.
_____/

     This is a gender discrimination case brought by plaintiff
Suzanne Mertes, a federal wage grade employee at Beale Air Force
Base, California.  Plaintiff seeks damages from the Secretary of
the Air Force for alleged gender discrimination, sexual harassment,
and retaliation under Title VII, 42 U.S.C. § 2000(e).  Pending
before the court is defendant's motion to dismiss and motion for
summary judgment.  The court resolves the motions upon the parties'
papers, supplemental briefing, and after oral argument.  For the
reasons explained below, the motions are granted in part and denied
in part.

1

## I. Facts[1]

2    Plaintiff is a female civilian employed at Beale Air Force

3 Base, California, as a Locomotive Engineer.  Def.'s Statement of

4 Undisputed Facts ("DSUF") ¶ 1.  She has worked at Beale for over

5 26 years.  Decl. of Suzanne Mertes ¶ 2.  She has been the

6 Locomotive Engineer at Beale since 1990 and operated a tractor-

7 trailer for the ten year period prior to that.  Id.  Plaintiff

8 first commenced her employment with Beale as a secretary.  Id.

9    The events giving rise to the complaint occurred shortly after

10 February 1, 2004, when an organizational structure known as the

11 Most Efficient Organization ("MEO") came into existence.  DSUF ¶

12 3.  As described in detail below, the facts revolve around three

13 central claims.   First, plaintiff maintains that she was

14 discriminated against when passed up for a promotion to temporary

15 supervisor and discriminated against again when that position

16 became permanent.  All the while, according to plaintiff, she was

17 in fact performing supervisory duties but defendants refused to

18 compensate her accordingly.  Second, plaintiff claims that she was

19 subjected to a hostile work environment.  Third, plaintiff alleges

20 that defendants retaliated against her when she complained of the

21 discrimination.

22    Plaintiff filed an administrative complaint of discrimination

23 on July 25, 2005 by contacting an Equal Employment Opportunity

24

25

26    [1] The facts are undisputed unless otherwise noted.

1  (EEO) counselor.[2]   The resulting administrative investigation

2  conducted by the agency concluded that the MEO is a hostile work

3  environment for female employees.   The agency's investigator

4  summarized her findings: "Looking at the record in totality, i.e.,

5  the lack of consideration received by the [plaintiff] for either

6  details or temporary promotions, management's less than credible

7  explanation as to why the [plaintiff] was not considered, the

8  hostile manner in which the draft core document was handed . . .

9  and each event the [plaintiff] brings forward as harassing in

10  nature, [the situation] would be intolerable for the average

11  employee."  Ex. A to Mot., at 25.

12  **A. Failure to Promote and Failure to Compensate**

13       In January 2005, the Material Movement Supervisor, a temporary

14  position not to exceed one year, was announced for competition.

15  DSUF ¶ 4.  Daniel Williams, plaintiff's immediate supervisor, was

16  the selecting official.   DSUF ¶ 5.  Plaintiff self-nominated for

17  the position, DSUF ¶ 6, but Williams chose another employee, Jay

18  Turner, who had previously been "detailed" to the position in 2004,

19  to fill the temporary position.[3]  DSUF ¶ 7.  Turner subsequently

20  became plaintiff's immediate supervisor.

21       Plaintiff maintains that by any objective measure, she was the

---

23       [2] Federal employees must "contact with a Counselor within 45

24  days of the date of the matter alleged to be discriminatory or, in
    the case of personnel action, within 45 days of the effective date
    of the action."  29 C.F.R. § 1614.105(a)(1).

25

26       [3] A detail is the temporary assignment of an employee to a
    position without an actual upgrade in pay or job status.

3

more qualified candidate.  At the time the position was posted, plaintiff occupied a "journey" level position at a WG-09 grade, whereas Turner was only a WG-05 entry level warehouse worker. Def.'s Mot., Ex. A.  Furthermore, of the 22 positions that were under the supervision of the Material Movement Supervisor, 18 related to the transportation field, and plaintiff's most recent 21 years of employment at Beale were in the transportation field. Mertes Decl. ¶ 23.  Plaintiff believes that Turner had no experience in the transportation field.  Id.

According to Williams, "supervisory experience was a key factor in [his] decision" and he selected Turner because of his knowledge that Turner had prior supervisory experience.  Williams Decl. ¶¶ 8, 9.  It is unclear what supervisory experience Turner possessed or how Williams came to know this information.  In any event, plaintiff also maintains that she had supervisory experience, as reflected in her Air Force career brief.  Mertes Decl. ¶ 17.  This supervisory experience, however, was obtained 24 years ago.  Supp. Decl. of Patti Yandell, Ex. D at 8.

Williams "name selected" Turner for the position.  Pl.'s Statement of Undisputed Fact ("PSUF") ¶ 6, 7.  Name selection is a procedure where the selecting official may, prior to publication of a list of eligible employees, indicate by name the employee she or he wishes to select.  Decl. of Linda McCory ¶ 23.  Name selection also occurs prior to a comparison of the applicants or career briefs.  Accordingly, plaintiff maintains that it is unlikely that Williams name selected Turner based on the extent of

4

his prior supervisory experience, even if subsequent information obtained from the career briefs fortuitously supported his initial choice.   Furthermore, plaintiff notes that the position was an entry level supervisory position, and that the announcement for the position neither required nor recommended prior supervisory experience.   PSUF ¶ 21.

In 2006, the Material Movement Supervisor position was announced as a permanent position.   DSUF ¶ 16.   Again, plaintiff submitted her name for consideration.   Mertes Depo. 147:22-148:12. Upon receipt of the candidate referral list, Williams decided not the fill the position at all.   DSUF ¶ 16.   Instead, he decided to have the position filled on a temporary basis by seven individuals referred on the list, one of whom was plaintiff, for temporary terms of approximately 56 days each.   Id.

From plaintiff's perspective, the irony of defendant's decision not to promote her to a supervisory position is that she was already performing supervisory work, but without the appropriate compensation.   For example, after the MEO came into existence in February 2004, Williams put plaintiff in charge of the Outbound Freight Area and allegedly promised her that she would receive supervisory credit for everything she was responsible for handling.   Mertes Decl. ¶ 3.   In this capacity, she was responsible for training all new employees, preparing the work area for inspections, and operating Power Track, a web-based program that enables the government to pay its bill through the U.S. Bank.   Id. Plaintiff was sent to specialized training in New York to learn

1   Power Track operation after the MEO commenced operations.   Id.
2   Previously, Power Track had been the responsibility of plaintiff's
3   supervisor.   Mertes Decl. ¶ 4.

4        When plaintiff assumed these new responsibilities, she did not
5   ask for an upgrade in pay or position because she had been told
6   that upgrades and promotions would not be allowed in the MEO.
7   Mertes Decl. ¶ 3.   She then observed certain male employees being
8   detailed to higher classifications or temporarily promoted.   Mertes
9   Decl. ¶ 6.   In addition to Turner's promotion to the temporary
10  Material Movement Supervisor position, plaintiff observed that
11  another male employee, originally hired as a Material Handler (WG-
12  05) after the MEO commenced operations in 2004, was name selected
13  for a new position, the Aircraft Flight Leader.   Mertes Decl. ¶ 10.

14       Accordingly, plaintiff asked Williams if she could be
15  considered for an upgrade or promotion based on the duties she was
16  performing.   Mertes Decl. ¶ 11; DSUF ¶ 9.   Williams then told her
17  that there could be no more promotions in the MEO but that she
18  could seek reclassification at the Civilian Personnel Office and
19  therefore encouraged her to draft a core document that described
20  her duties.   Mertes Decl. ¶ 12; DSUF ¶ 10.   Ultimately, however,
21  Williams told plaintiff that Harl Sanderson, a member of the MEO
22  management team, told him to tell her that any hope of an upgrade
23  was a "dead issue."   Mertes Decl. ¶ 12.

24       In fact, when plaintiff approached Sanderson and Wardell
25  Montgomery, another member of the MEO management team, for help in
26  re-drafting her core documents to describe her then extant duties,

1  plaintiff was stripped of responsibility for Power Track.
2  Initially, Sanderson told plaintiff to continue performing all her
3  duties, including Power Track.  Mertes Decl. ¶ 14.  After being
4  informed that Power Track duties were fiduciary in nature and thus
5  should be performed by a person with a higher grade, Sanderson
6  reassigned plaintiff to train Turner, then her supervisor, in the
7  operation of Power Track.  Mertes Decl. ¶ 15.  Turner only showed
8  up once for training, and Sanderson then created a new, temporary
9  position to assist in performing Power Track duties.  Id.  Although
10  plaintiff had been sent to training in New York to learn the
11  operation, the new assistant was sent to Florida and Travis AFB for
12  Power Track training.   Id.

13  **B. Hostile Work Environment**

14      Plaintiff also maintains that she was subjected to gender
15  discrimination by exposure to a hostile work environment.  Various
16  members of the management team of the MEO referred to plaintiff as
17  "rough around the edges," "not management material," a "whiner,"
18  "complainer," "troublemaker," and a "blue collar type."  McCory
19  Decl. ¶ 11.  One said that he would never select plaintiff for any
20  kind of supervisory position, and that if plaintiff did not operate
21  the locomotive, she would be nothing more than a WG-06 employee.
22  McCory Decl. ¶¶ 11, 19, 36.  That same supervisor described another
23  female worker as "just an angry black woman."  Id. ¶ 11.  Another
24  supervisor complained that all plaintiff did was bitch and moan.
25  Id. ¶ 36.

26      A male co-worker called plaintiff a bitch and psycho to her

7

1    face and in the presence of co-workers.  Mertes Decl. ¶ 28.  When
2    plaintiff said that she intended to report his behavior, he told
3    her to go ahead because no one was going to do anything about it
4    and that no one liked her.   Id.  Furthermore, when plaintiff
5    reported this co-worker's behavior, Williams told plaintiff that
6    she needed to be patient with the co-worker because he was young
7    and the MEO management team needed to train him.   Id.  The co-
8    worker was reassigned away from plaintiff's area for a short time
9    and then was later reassigned to work near plaintiff.   Id. ¶ 29.
10   It does not appear that he was ever disciplined for his conduct.

11       Plaintiff   also   states   that   Turner   began   treating   her
12   differently after plaintiff submitted her request for an upgrade
13   in her position.   For example, during a meeting, Turner told
14   plaintiff to "shut up" in front of others, and on another occasion,
15   told her to "get out of my office."  Mertes Decl. ¶ 30.  He also
16   allegedly told a male sergeant to stop by and tell her happy
17   birthday because she had turned 50 and seemed to be menopausal.
18   Id.

19   **C. Retaliation**

20       Plaintiff alleges fourteen acts of retaliation and reprisal
21   in response to her complaint of gender discrimination.   The first
22   and second acts concern allegedly false statements made to the
23   Civilian Personnel Officer that plaintiff was not performing
24   supervisory duties and the refusal to acknowledge plaintiff's
25   request to be reclassified.   Mertes Decl. ¶ 12.  The third act
26   concerns the allegedly false statement that promotions were not

1   permitted under the MEO.  Id. ¶¶ 3, 6, 7, 10, 12.  The fourth and

2   fifth acts both concern Turner's conduct toward plaintiff (e.g.,

3   yelling at her to "shut up" in the presence of others and refusing

4   to speak to plaintiff on matters for which she was responsible).

5   Id. ¶¶ 30, 31.

6       The sixth and seventh acts concern plaintiff's Power Track

7   duties and, specifically, the fact that plaintiff was forced to

8   train Turner on Power Track and that her Power Track duties were

9   assigned away to other employees.  Mertes Decl. ¶ 15.  In the

10  eighth and ninth acts, plaintiff claims that her supervisors told

11  her she was spending too much time at the Civilian Personnel Office

12  and counseled her against doing so.  Id. ¶ 34.  The tenth act of

13  retaliation involves a somewhat incredible demand.  Plaintiff was

14  apparently told to email Turner, her supervisor, every single time

15  she left the facility, even though her duties required her to

16  frequently leave the facility.  Id. ¶ 33.

17      In the eleventh act, plaintiff alleges that she was downgraded

18  on her performance evaluation.  Mertes Decl. ¶ 31.  Plaintiff

19  alleges in her twelfth act that management falsely claimed that she

20  did not get along with men.  In the thirteenth act, plaintiff

21  alleges that management threatened to remove the operation of the

22  locomotive from plaintiff's duties.  McCory Decl. ¶ 11.  Finally,

23  plaintiff claims in the fourteenth act that defendant chose not to

24  fill the permanent Material Movement Supervisor position to

25  retaliate against her.  DSUF ¶ 16.

26  ////

**II. Standards**

**A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1)**

It is well established that the party seeking to invoke the jurisdiction of the federal court has the burden of establishing that jurisdiction exists. KVOS, Inc. v. Associated Press, 299 U.S. 269, 278 (1936); Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986). On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the standards that must be applied vary according to the nature of the jurisdictional challenge.

If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made. The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction. See 2A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice ¶ 12.07 (2d ed. 1987); see also Eaton v. Dorchester Development, Inc., 692 F.2d 727, 731 (11th Cir. 1982); Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981), cert. denied, 454 U.S. 897 (1981); Mortensen v. First Fed. Sav. & Loan Ass'n., 549 F.2d 884, 891 (3d Cir. 1977). A complaint will be dismissed for lack of subject matter jurisdiction (1) if the case does not "arise under" any federal law or the United States Constitution, (2) if there is no case or

1 controversy within the meaning of that constitutional term, or (3)

2 if the cause is not one described by any jurisdictional statute.

3 Baker v. Carr, 369 U.S. 186, 198 (1962).

4     If the challenge to jurisdiction is made as a "speaking

5 motion" attacking the truth of the jurisdictional facts alleged by

6 the plaintiff, a different set of standards must be applied.

7 Thornhill Pub. Co., Inc. v. General Tel. & Elec. Corp., 594 F.2d

8 730, 733 (9th Cir. 1979). Where the jurisdictional issue is

9 separable from the merits of the case, the district court is free

10 to hear evidence regarding jurisdiction and to rule on that issue

11 prior to trial, resolving factual disputes where necessary.

12 Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983);

13 Thornhill, 594 F.2d at 733. "In such circumstances '[n]o

14 presumptive truthfulness attaches to plaintiff's allegations, and

15 the existence of disputed material facts will not preclude the

16 trial court from evaluating for itself the merits of jurisdictional

17 claims.'" Augustine, 704 F.2d at 1077 (quoting Thornhill, 594 F.2d

18 at 733).

19        However, where the jurisdictional issue and substantive
       issues are so intertwined that the question of
20        jurisdiction is dependent on the resolution of factual
       issues going to the merits, the jurisdictional
21        determination should await a determination of the
       relevant facts on either a motion going to the merits
22        or at trial.

23 Augustine, 704 F.2d at 1077 (citing Thornhill, 594 F.2d at 733-35;

24 5 C. Wright & A. Miller, Federal Practice & Procedure § 1350, at

25 558 (1969 & Supp. 1987)). On a motion going to the merits, the

26 court must, of course, employ the standard applicable to a motion

1  for summary judgment.  <u>Farr v. United States</u>, 990 F.2d 451, 454 n.

2  1 (9th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1023 (1993).

3  **B. Summary Judgment Under Federal Rule of Civil Procedure 56**

4       Summary judgment is appropriate when it is demonstrated that

5  there exists no genuine issue as to any material fact, and that the

6  moving party is entitled to judgment as a matter of law.  Fed. R.

7  Civ. P. 56(c); <u>see also</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,

8  157 (1970); <u>Secor Ltd. v. Cetus Corp</u>., 51 F.3d 848, 853 (9th Cir.

9  1995).

10      Under summary judgment practice, the moving party

11      always bears the initial responsibility of informing the
        district court of the basis for its motion, and
12      identifying those portions of "the pleadings,
        depositions, answers to interrogatories, and admissions
13      on file, together with the affidavits, if any," which it
        believes demonstrate the absence of a genuine issue of
14      material fact.

15  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the

16  nonmoving party will bear the burden of proof at trial on a

17  dispositive issue, a summary judgment motion may properly be made

18  in reliance solely on the 'pleadings, depositions, answers to

19  interrogatories, and admissions on file.'"  <u>Id.</u>  Indeed, summary

20  judgment should be entered, after adequate time for discovery and

21  upon motion, against a party who fails to make a showing sufficient

22  to establish the existence of an element essential to that party's

23  case, and on which that party will bear the burden of proof at

24  trial.  <u>See</u> <u>id.</u> at 322.  "[A] complete failure of proof concerning

25  an essential element of the nonmoving party's case necessarily

26  renders all other facts immaterial."  <u>Id.</u>  In such a circumstance,

1  summary judgment should be granted, "so long as whatever is before

2  the district court demonstrates that the standard for entry of

3  summary judgment, as set forth in Rule 56(c), is satisfied." Id.

4  at 323.

5      If the moving party meets its initial responsibility, the

6  burden then shifts to the opposing party to establish that a

7  genuine issue as to any material fact actually does exist.

8  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

9  586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

10 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

11     In attempting to establish the existence of this factual

12 dispute, the opposing party may not rely upon the denials of its

13 pleadings, but is required to tender evidence of specific facts in

14 the form of affidavits, and/or admissible discovery material, in

15 support of its contention that the dispute exists.  Fed. R. Civ.

16 P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l

17 Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

18 1998).  The opposing party must demonstrate that the fact in

19 contention is material, i.e., a fact that might affect the outcome

20 of the suit under the governing law, Anderson v. Liberty Lobby,

21 Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of

22 Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)

23 (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,

24 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is

25 genuine, i.e., the evidence is such that a reasonable jury could

26 return a verdict for the nonmoving party, Anderson, 477 U.S. 248-

49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); see also In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th Cir. 1999). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing

1  party's obligation to produce a factual predicate from which the

2  inference may be drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602

3  F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902

4  (9th Cir. 1987).

5       Finally, to demonstrate a genuine issue, the opposing party

6  "must do more than simply show that there is some metaphysical

7  doubt as to the material facts. . . . Where the record taken as a

8  whole could not lead a rational trier of fact to find for the

9  nonmoving  party,  there  is  no  'genuine  issue  for  trial.'"

10 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

11                          **III. Analysis**

12 **A. Failure to Promote and Failure to Compensate**

13     **1. Temporary Supervisor Position**

14     Title VII of the Civil Rights Act makes it an unlawful

15 employment practice to fail to hire or otherwise discriminate

16 against any individual because of such individual's sex.  42 U.S.C.

17 § 2000e-2(a).  Plaintiffs may meet the burden of proving a prima

18 face case of discrimination in one of two ways.  <u>McDonnell Douglas</u>

19 <u>v. Green</u>, 411 U.S. 792, 801 (1973); <u>Texas Dep't of Community</u>

20 <u>Affairs v. Burdine</u>, 450 U.S. 248, 251 (1981).  First, plaintiffs

21 may show direct evidence of discrimination.  <u>Washington v. Garrett</u>,

22 10 F.3d 1421, 1434 (9th Cir. 1994).  Second, plaintiffs may produce

23 evidence  that  raises  an  inference  that  discrimination  was  a

24 motivating  factor  for  the  challenged  employment  decision.

25 <u>McDonnell Douglas</u>, 411 U.S. at 801.

26 ////

### a. Prima Facie Case

Here, defendant concedes that plaintiff can establish a prima facie case.   To make out a prima facie case of gender discrimination, plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position sought, (3) she was denied the position, and (4) the employer hired a man for the position.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993).  It is undisputed that Ms. Mertes is female, was at least minimally qualified for the temporary Material Movement Supervisor position, was denied the position, and that Jay Turner, a male, ultimately filled the job.

### b. Legitimate, Non-discriminatory Reason

Once plaintiff has established the prima facie case, the burden then shifts to defendant to demonstrate that the adverse employment action occurred for a legitimate non-discriminatory reason.  Burdine, 450 U.S. at 252.  The defendant's burden with respect to this stage of the analysis is merely one of production, and "defendant need not persuade the Court that it was actually motivated by the proffered reasons."  Id. at 254.

Here, defendant maintains that the main reason that Williams selected Turner was based on Turner's supervisory experience.  As noted above, Williams has stated that he was aware of this experience. Williams Decl. ¶ 9. This satisfies defendant's burden of production in coming forward with a facially plausible non-discriminatory reason for the employment decision.

////

1              **c. Pretext**

2      Finally, once defendant establishes the existence of a

3 legitimate non-discriminatory reason, the <u>McDonnell Douglas</u>

4 presumption drops out of the picture, and plaintiff must

5 demonstrate this proffered reason was not the true reason for the

6 employment decision. <u>Burdine</u>, 450 U.S. at 253. She may do this

7 "either directly by persuading the court that a discriminatory

8 reason more likely motivated the employer or indirectly by showing

9 that the employer's proffered explanation is unworthy of credence."

10 <u>Id.</u> at 256.

11      Here, plaintiff argues that first, at the time Williams name

12 selected Turner, he did not have access to Turner's career brief,

13 and therefore could not have relied on the extent of Turner's prior

14 supervisory experience. Even if Turner's career brief ultimately

15 confirmed Williams' initial choice post hoc, this would not erase

16 the original discrimination. Second, plaintiff maintains that her

17 undisputedly greater experience in the transportation field

18 (spanning two decades) far outweighed any advantage that Turner

19 might have had with regard to supervisory experience, although she

20 also contends that she did have some, albeit not much, supervisory

21 experience.

22      Third, plaintiff notes that "subjective practices are

23 particularly susceptible to discriminatory abuse and should be

24 closely scrutinized." <u>Warren v. City of Carlsbad</u>, 58 F.3d 439, 443

25 (9th Cir. 1995) (internal quotation marks omitted). Because

26 supervisory experience was not required or recommended in the job

1 announcement, Williams' explanation of emphasizing supervisory
2 experience -- particularly for an entry level supervisory position
3 -- does appear subjective, although, arguably, it would not be
4 unreasonable to place weight on such experience.

5     Taken together, a reasonable jury could find that defendant's
6 proffered explanation was merely pretext for discrimination.
7 Accordingly, summary judgment with respect to the temporary
8 supervisor position must be denied.

9     **2. Permanent Supervisor Position**

10     With regard to the discrimination claim pertaining to the
11 permanent supervisor position announced in 2006, defendant argues
12 that plaintiff failed to exhaust her administrative remedies.
13 Federal employees cannot bring claims of employment discrimination
14 unless they have exhausted their administrative remedies.
15 Vinieratos v. United States Department of Air Force, 939 F.2d 762,
16 769 (9th Cir. 1991). The failure to exhaust administrative
17 remedies bars subject matter jurisdiction. B.K.B. v. Maui Police
18 Dep't, 276 F.3d 1091, 1099 (9th Cir. 2002).

19     Here, plaintiff initiated her complaint of discrimination on
20 July 25, 2005 and the agency's Notice of Final Interview was issued
21 on October 17, 2005. In the Notice, plaintiff's complaint was
22 described as follows: "When other employees (all males) were being
23 promoted, you asked to be considered for a promotion." Ex. A to
24 Mot. at 4. In the formal EEO complaint filed on October 19, 2005,
25 plaintiff requested relief in the form of "promotion to WS position
26 over locomotive operations and cargo movement area." Ex. A. to

1    Mot. at 8.   The Report of Investigation stated plaintiff's claim

2    as discrimination "on the basis of sex (female) when she was not

3    considered for promotions within her flight and all promotions have

4    been given to males."   Ex. A. to Mot. at 196.

5        Plaintiff's EEO complaint and the subsequent EEO investigation

6    indicate that plaintiff was complaining generally of a failure to

7    promote, not simply a failure to promote to the temporary

8    supervisor position.   Moreover, the court's jurisdiction is not

9    tethered to the actual EEO investigation "but can include the scope

10   of an [] investigation which can *reasonably be expected* to grow out

11   of a charge of discrimination."   E.E.O.C. v. Farmer Bros. Co., 31

12   F.3d 891, 899 n.5 (9th Cir. 1994) (internal quotation marks

13   omitted; emphasis in original). Incidents of discrimination "like

14   or reasonably related to" the EEO charge of discrimination are

15   within the court's jurisdiction.   Sosa v. Hiraoka, 920 F.2d 1451,

16   1456 (9th Cir. 1990).

17       Here, a failure to promote plaintiff to the temporary Material

18   Movement Supervisor position in 2005 is certainly "reasonably

19   related to" the failure to promote her to the same permanent

20   position a year later.   See Chung v. Pomona Valley Community Hosp.,

21   667 F.2d 788, 792 (9th Cir. 1982) (whether denial of subsequent

22   promotion was "like or reasonably related to" denial of earlier

23   promotion was at least a triable issue of fact).

24       Defendant argues that the Supreme Court's recent decision in

25   Ledbetter changes the law, because a new EEOC charging period is

26   triggered upon each "discrete act" of discrimination.   Ledbetter

19

1 <u>v. Goodyear Tire & Rubber Co.</u>, -- U.S. --, 127 S. Ct. 2162 (2007).

2 In <u>Ledbetter</u>, the plaintiff argued that she received lower pay than

3 her male colleagues over a lengthy period of time, but the Court

4 held that she could only recover for discriminatory acts that

5 occurred during the 180 day EEOC charging period.  <u>Id.</u> at 2169

6 ("[I]f an employer engages in a series of discriminatory acts each

7 of which is intentionally discriminatory, then a fresh violation

8 takes place when each act is committed.").

9 　　　In other words, the plaintiff in <u>Ledbetter</u> complained of pay

10 discrimination too late.  Here, however, defendant seems to argue

11 that plaintiff did not complain about discrimination enough,

12 because although she had already once complained about a failure

13 to promote, she did not complain again about the repeated failure

14 to promote her for essentially the same job.

15 　　　There was no need for plaintiff to do so.  <u>See</u> <u>Anderson v.</u>

16 <u>Reno</u>, 190 F.3d 930, 938 (9th Cir. 1999) (stating that "forcing an

17 employee to begin the administrative process anew after additional

18 occurrences of discrimination in order to have them considered by

19 the agency and the courts would erect a needless procedural

20 barrier") (internal quotation marks omitted), <u>overruled on other</u>

21 <u>grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101

22 (2002).[4]  Her complaint about the permanent position was "like or

23 ─────────────

24 　　　[4] Defendant cites to <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210-
11 (10th Cir. 2003), which stated that there is a separate charging

25 period for each discrete act of discrimination, even for "discrete
. . . incidents occurring after the filing of Plaintiff's

26 complaint."  <u>See also</u> <u>Turner v. Public Serv. Co. of Colo.</u>, 2007 WL
2422151 at *2 (D. Colo. Aug. 22, 2007).  The Ninth Circuit,

1    reasonably related to" her original charge.  See Oubichon v. N. Am.

2    Rockwell Corp., 482 F.2d 569, 571 (9th Cir. 1973) ("[T]he judicial

3    complaint nevertheless may encompass any discrimination like or

4    reasonably related to the allegations of the EEOC charge, including

5    new acts occurring during the pendency of the charge before the

6    EEOC."); see also Sosa, 920 F.2d at 1456-57.

7         Ledbetter has not overruled this rule, at least with respect

8    to incidents of discrimination occurring after the initial charge.

9    In Lyons v. England, 207 F.3d 1092 (9th Cir. 2002), the Ninth

10   Circuit addressed the Supreme Court's holding in Morgan, 536 U.S.

11   101, subsequently reaffirmed in Ledbetter, that "discrete

12   discriminatory acts are not actionable if time barred, even when

13   they are related to acts alleged in timely filed charges."  207

14   F.3d at 1105.  Nevertheless, Lyons continued to rely upon the rule

15   that "like or reasonably related" incidents of discrimination may

16   be considered part of the EEOC charge.  Id. at 1103-04.  Moreover,

17   Ledbetter's concerns about the underlying purposes of statutes of

18   limitation (e.g., notice to defendant, stale evidence) are absent

19   where the plaintiff complains of discrimination and the

20   discrimination happens again, at a later date.

21        Plaintiff also claims that she was discriminated against when

22   Turner was first detailed to the Material Movement Supervisor

23   position in 2004, which occurred prior to his actual appointment

24   to the temporary Material Movement Supervisor position in 2005.

25   _____

26   however, has apparently taken a different approach.

                                   21

1  With respect to this "failure to detail" claim, the court finds
2  that plaintiff did not timely contact an EEO counselor within 45
3  days (given that plaintiff's complaint was not initiated until July
4  25, 2005).   Because this alleged instance of discrimination
5  occurred prior to plaintiff's 2005 complaint, the policy concerns
6  that animate statutes of limitation apply here.   Accordingly, the
7  court finds that plaintiff failed to exhaust her administrative
8  remedies over the failure to detail claim.

9  **3. Failure to Compensate for Duties Performed**

10  Plaintiff also alleges that defendant's refusal to upgrade her
11  pay based on the duties she was performing was motivated by gender
12  discrimination.   In order to establish a prima facie case with
13  regard to this claim, plaintiff must prove that (1) she is a member
14  of a protected class, (2) she was the subject of an adverse
15  employment decision, and (3) she was adversely treated because of
16  her status in a protected group.  McDonnell Douglas, 411 U.S. at
17  801.   Here, plaintiff is a female and she was not upgraded or
18  reclassified at a higher pay.  Defendant argues, however, that she
19  was not adversely treated because of her status.

20  As noted above, plaintiff has provided evidence that several
21  males were detailed and/or promoted, even though plaintiff had been
22  told that promotions were not allowed in the MEO.  McCory Decl. ¶¶
23  20-26.  Moreover, core documents of other employees were re-written
24  for the purpose of allowing them to qualify for a promotion.  Id.
25  This is enough to make at least a prima facie showing that
26  similarly situated employees were treated differently and that

1    plaintiff was therefore adversely treated because of her gender.

2    Indeed, this evidence is enough for a reasonable jury to find

3    that defendant's proffered reasons for their employment decisions

4    were either false, because they shifted over time, or that they

5    were pretext for discrimination.   Defendant maintains that its

6    reason for not reclassifying plaintiff or paying her at a higher

7    grade is that she was not performing duties for such action under

8    the Office of Personnel Management Federal Wage System Job Grading

9    Standard for Supervisors.   According to that standard, employees

10   must exercise technical and administrative supervision over

11   subordinate workers.   Yandell Decl. ¶ 9.

12   Defendant relies on plaintiff's core personnel document in

13   determining whether her job duties met that standard; as plaintiff

14   complains, however, defendant refused to adjust plaintiff's

15   document to reflect all the duties that she was performing.[5]

16   McCory Decl. ¶ 37.   Furthermore, Linda McCory, then Beale's

17   Civilian Personnel Director, believed that "some of [plaintiff's]

18   work would very likely be considered higher level work and possibly

19   supervisory in nature."   Id.   Plaintiff also maintains that she

20   was held accountable by her supervisor for other employees in her

21   area, that she was responsible for training employees in various

22   assignments, and that she was, at least early on, responsible for

23   Power Track, which invested her with fiduciary responsibilities.

24

25   [5] Plaintiff's core personnel document was partially revised
on February 16, 2006 to include wood working and motor vehicle
operator, DSUF ¶ 14, but not to include what plaintiff maintains
26   were supervisory responsibilities.

23

1   Taken together, this is enough to create a triable issue of fact
2   that plaintiff deserved a supervisory classification and/or more
3   pay.

4   **B. Hostile Work Environment**

5       **1. Prima Facie Case**

6       To show a prima facie hostile work environment claim,
7   plaintiff must show that (1) she was subject to unwelcome conduct
8   or comments, (2) the harassment complained of was based on gender,
9   and (3) the conduct was sufficiently severe or pervasive to alter
10  the terms and conditions of plaintiff's employment.  <u>Meritor</u>
11  <u>Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 57 (1986).  Factors to
12  be considered in this analysis include the frequency of the
13  conduct, its severity, whether it was physically threatening or
14  humiliating, and whether it unreasonably interfered with the
15  plaintiff's work performance.  <u>Harris v. Forklift Systems, Inc.</u>,
16  510 U.S. 17, 23 (1993).

17      First, defendant argues that the alleged harassment was not
18  "because of" sex.  In <u>Galloway</u>, the Seventh Circuit found that the
19  phrase "sick bitch" was simply a pejorative term, because "it does
20  not necessarily connote some specific female characteristic,
21  whether true, false, or stereotypical; it does not draw attention
22  to the woman's sexual or maternal characteristics or to other
23  respects in which women might be thought to be inferior to men in
24  the workplace, or unworthy of equal dignity and respect." <u>Galloway</u>
25  <u>v. General Motors Serv. Parts Operations</u>, 78 F.3d 1164, 1168 (7th
26  Cir. 1996).

1    Under Ninth Circuit law, however, "there is no legal
2 requirement that hostile acts be overtly sex- or gender-specific
3 in content, whether marked by language, by sex or gender
4 stereotypes, or by sexual overtures"; the relevant question is
5 whether "members of one sex are exposed to disadvantageous terms
6 or conditions of employment to which members of the other sex are
7 not exposed." Equal Employment Opportunity Comm'n v. Nat'l Educ.
8 Ass'n, 422 F.3d 840, 844 (9th Cir. 2005) (internal quotation marks
9 omitted). Accordingly, while it seems fairly obvious that "bitch"
10 is, on its face, a term that is used "because of sex," even if it
11 were not, plaintiff could still show that it was indirectly used
12 (as a generically derogatory term) because of her sex.

13    Second, defendant argues that the conduct faced by plaintiff
14 was not severe or pervasive enough as a matter of law to support
15 a finding of a hostile work environment. In Kortan, the Ninth
16 Circuit found no hostile work environment where a supervisor called
17 female employees "castrating bitches" and "Madonnas." Kortan v.
18 Cal. Youth Authority, 217 F.3d 1104, 1108 (9th Cir. 2000).

19    Here, however, the conduct faced by plaintiff was not limited
20 to being called a "bitch" and "psycho" by a co-worker. That same
21 co-worker also told plaintiff that she could try to complain to
22 management but that her complaint would, in effect, fall on deaf
23 ears, because she was out of favor with management. As noted
24 above, Turner, plaintiff's immediate supervisor, also told her to
25 shut up and get out of his office in the presence of others. There
26 is a genuine dispute as to whether a reasonable woman would find

1   this sufficiently severe and pervasive so as to alter the terms of

2   her employment.  Ellison v. Brady, 924 F.2d 872, 878 (9th Cir.

3   1991) (standard is reasonable victim, which takes into account

4   victim's sex).

5        Finally, defendant argues that it took appropriate corrective

6   action by reassigning the worker to a different area of the

7   warehouse.  See Swenson v. Potter, 271 F.3d 1184, 1192 (9th Cir.

8   2001).   Nevertheless, based on the record, it appears that

9   defendant did not discipline the co-worker for his disparaging

10  comments, a critical factor in determining whether the employer's

11  corrective action was appropriate and reasonably calculated to end

12  harassment.  Ellison, 924 F.2d at 882 ("Employers send the wrong

13  message to potential harassers when they do not discipline

14  employees for sexual harassment.").  Accordingly, the court denies

15  summary judgment as to the hostile work environment claim.

16  **C. Retaliation**

17       To make a prima face case of retaliation, plaintiff must show

18  that (1) she engaged in protected activity, (2) she was subject to

19  an adverse employment action, and (3) a causal link exists between

20  the protected activity and the adverse action.  Ray v. Henderson,

21  217 F.3d 1234, 1240 (9th Cir. 2000).  The adverse employment action

22  must be materially adverse, in that it would dissuade a reasonable

23  employee from engaging in the protected activity.  Burlington N.

24  & Santa Fe. Ry. Co. v. White, -- U.S. --, 126 S. Ct. 2405, 2415

25  (2006).

26       Here, the parties dispute when plaintiff first engaged in

1  protected activity.  Defendant places that event on July 25, 2005,

2  when plaintiff filed her informal EEO complaint of discrimination.

3  Plaintiff, however, places that event earlier, when, in 2004, she

4  went to her supervisor and told him that she, like others, deserved

5  to be compensated for the duties that she was actually performing.

6  The others to whom she compared herself were males.  Mertes Decl.

7  ¶ 11.

8      Title VII makes it unlawful for an employer to discriminate

9  against any individual because he or she has "opposed any practice

10 made an unlawful employment practice" (the so-called opposition

11 clause) or "participated in any manner in an investigation or

12 proceeding" (the so-called participation clause)  42 U.S.C. §

13 2000e-3.  The classic example of protected activity is the act of

14 filing a discrimination complaint.  But "informal protests of

15 discriminatory employment practices, including making complaints

16 to management, . . . protesting against discrimination by industry

17 . . . , and expressing support for co-workers who have filed formal

18 charges" also constitute protected activity.  See, e.g., Curay-

19 Cramer v. Ursuline Academy of Wilmington, Delaware, Inc., 450 F.3d

20 130, 135 (3d Cir. 2006).

21     Here, plaintiff alleges that she was compensated less than

22 similarly situated males because of defendant's discrimination.

23 Accordingly, when she complained of the pay disparity, she was

24 "oppos[ing] a[] practice made an unlawful employment practice"

25 within the meaning of Title VII.  42 U.S.C. § 2000e-3.  There is

26 no requirement that plaintiffs utter a magic word, such as

1   "discrimination," in order to oppose a discriminatory practice.

2   Accordingly, the court finds that the first date of plaintiff's

3   protected activity was when she requested a pay raise in 2004.[6]

4   **1. Acts 1 and 2 (falsely telling CPO that plaintiff was not**

5   **performing supervisory duties and refusing reclassification)**

6   With regard to these acts, defendant argues that it had a

7   legitimate non-discriminatory reason for its decision.

8   Nevertheless, as addressed above, the issue of whether plaintiff

9   was actually performing supervisory duties is a question for the

10  jury.

11  **2. Acts 4 and 5 (Turner's treatment toward plaintiff)**

12  Defendant argues that Turner's treatment of plaintiff --

13  telling her to shut up and then refusing to speak with her -- is

14  the type of personality conflict that is not materially adverse.

15  See Burlington, 126 S. Ct. at 2415. Nevertheless, this was not a

16  "petty slight[] or minor annoyance[]," id.; rather, a jury could

17  conclude that this is the type of conduct that "could well dissuade

18  a reasonable worker from making or supporting a charge of

19  discrimination." Id. at 2409.

20  ////

21

---

22  [6] The court therefore rejects defendant's argument that the
    retaliatory conduct alleged with regard to acts 1 and 2 (falsely
23  telling CPO that plaintiff was not performing supervisory duties
    and refusing reclassification), 3 (falsely stating that promotions
24  were not allowed), 10 (directing plaintiff to email her supervisor
    every time she left her work area), 11 (downgrading plaintiff's
25  performance evaluation), and 13 (threatening to remove plaintiff's
    locomotive duties) temporally preceded the date of plaintiff's
26  protected activity.

**3. Acts 6 and 7 (redelegation of Power Track duties)**

With regard to these acts, defendant merely asserts that they were not materially adverse.  Again, however, a reasonable jury could find that stripping an employee of certain duties would deter him or her from engaging in protected activity.

**4. Acts 8 and 9 (counseling plaintiff for spending too much time at CPO)**

Similarly, defendant argues that counseling an employee for spending too much time at a personnel office is not a materially adverse action.  This too, however, is a question for the jury to resolve.

**5. Act 12 (claiming that plaintiff did not get along with men)**

Defendant argues that any claim that management said that plaintiff did not get along well with men is inadmissible as hearsay, because no one directly told plaintiff that she did not get along well with men.  Because plaintiff has failed to respond to this, the court grants summary judgment on this issue.

**6. Act 14 (failure to fill permanent supervisor position)**

With regard to this claim, defendant merely renews its objections regarding plaintiff's failure to exhaust administrative remedies.  As noted above, the court finds that this instance of discrimination was reasonably related to the earlier incidents of discrimination previously alleged.

////

////

////

1                          **IV. Conclusion**

2          For the reasons explained above, the motion to dismiss and

3     motion for summary judgment are granted in part and denied in part.

4          IT IS SO ORDERED.

5          DATED:  October 26, 2007.

6

7

8                               LAWRENCE K. KARLTON
                                SENIOR JUDGE
9                               UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26